## DOIG v. MORGAN MACH. CO.

(Circuit Court of Appeals, Second Circuit. April 16, 1903.)

### No. 109.

**1. PATENTS—ANTICIPATION.**

Anticipation is not avoided by the fact that the anticipating patent was granted to the same patentee.

**2. SAME—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.**

The commercial success of a complicated machine, covered by a patent containing a large number of claims, is not persuasive evidence, in itself, that a single element or part of the machine involves invention.

**3. SAME—BOX-NAILING MACHINE.**

The Smith & Doig patent, No. 342,268, for a box-nailing machine, claims 5 and 6, *held* void for lack of patentable invention.

Appeal from the Circuit Court of the United States for the Western District of New York.

For opinion below, see 117 Fed. 305.

This cause comes here upon appeal from a decree of the Circuit Court, Western District of New York, dismissing the bill. The suit was upon United States patent No. 342,268, May 18, 1886, to Wm. S. Doig, assignee of Smith & Doig, for improvements in box-nailing machines. This patent and another were declared upon in the action of Doig v. Sutherland (C. C.) 87 Fed. 991, and claims 1, 3, 5, and 6 were held valid and infringed. Upon the strength of the decision in the Sutherland Case, a preliminary injunction was granted in the case at bar. (C. C.) 89 Fed. 489. Upon appeal this court affirmed that decision without passing upon the merits, leaving all questions relating thereto to come up on appeal from decree on final hearing. 33 C. C. A. 683, 91 Fed. 1001.

Wilson W. Hoover, for appellant.

F. F. Church, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). The invention relates to improvements in box-nailing machines, and has reference, as the specification states, "to the nail receiving and distributing device, and to the nail conducting and driving mechanism." Box-nailing machines are complicated structures, with many parts, performing many different functions, as may well be supposed when it is understood that, at one end of the machine, nails are loosely thrown into a hopper or nail-supply pan, and from another end boxes are removed, into which the nails have been properly driven at regular spaces. The machine itself arranges the nails, head up, in the nail-supply pan, passes them on to nailways, down which they move till they are arrested by

¶ 1. See Patents, vol. 38, Cent. Dig. § 79.

a stop which transfers them into a chute, through which they are dropped to a nail box or chuck, which holds them in a proper position above the part of the box which is to be nailed, whereupon a punch descends and drives them home. To describe this intricate mass of mechanism in detail, the specification consumes 620 lines, and its text is illustrated by 37 drawings. There are 24 claims.

The following excerpts from the description refer to the subject-matter of claims 5 and 6:

"The nails [are] discharged from the channels [of the nail-supply pan] and carried down the nailways, $p^2$, formed between the pairs of plates, $P^1$, $P^2$, constituting the nailways, $p^2$. The series of plates, $P^1$, are bolted or connected to a rectangular frame, $P^4$, which is held rigidly in position laterally by means of extensions, $P^8$, forming part of the rear bar of the said frame, $P^4$. The extensions, $P^8$, are pivoted in brackets, $p^3$, $p^4$, formed on or affixed to the framing, p. The series of plates, $P^2$, are bolted or connected to a rectangular frame, $P^5$, the front and rear bars of which, $p^5$, $p^6$, rest against and slide upon the front and rear bars of the frame, $P^4$. The frame, $P^5$, and its plates, $P^2$, are retained in position laterally by means of adjusting screws, $P^6$, $P^7$, tapped into lugs, $P^7$, formed on the faces of the end pieces of the frame, $P^5$. The front ends of the screws, $P^6$, $P^7$, bear against the end portions of the frame, $P^4$. By slackening or withdrawing one or other of the set screws, $P^6$, $P^7$, and forcing up the opposite one of said pair of adjusting-screws, the width of the nailways, $p^2$, will be regulated to accommodate any size or grade of nail."

A brief description of an attachment devised "for the purpose of rocking the frames, $P^4$, $P^5$, every time it is desired to feed a nail," and "which causes the outer end of the feeding-mechanism to be raised and lowered alternately every time a nail is fed through the device, in order to facilitate its passage," need not be quoted, since it forms the subject-matter of the twenty-third claim, which is not here in controversy. The two claims in suit are:

"(5) The combination, in a nail-feeding mechanism, of a frame or support provided with a series of way-plates with a second frame or support, also provided with a series of way-plates, the way-plates of the said frames or supports being arranged to act in pairs to form nailways, one series being adjustable in relation to the other laterally, substantially as and for the purpose set forth.

"(6) The combination, with the nail-feeding mechanism, of a pair of way-plate supporting frames, adjustable laterally one to the other, and the frame-adjusting screws, substantially as shown and described."

The state of the art, and the measure of advance which the device covered by these claims discloses, may be taken entirely from the testimony of complainant's own experts:

"Claim 5 is for a combination of way-plates arranged in pairs, the mates of each pair being respectively secured to separate frames or supports, and these frames or supports made adjustable, one to the other, whereby to adjust the mates of each pair of way-plates toward or from each other simultaneously, to regulate the width of the nailways or channels between them. Hitherto, so far as I have been able to ascertain from an examination of the state of the art as shown in prior patents, no device was known whereby to adjust a series of way-plates (consisting of the mates of each pair) all at once. As I understand it, way-plates forming nailways were not new at the date of this invention, nor were adjustable way-plates new. For the most part, they were made adjustable, but, when so made, were only adjust-

able by separate screws for each way-plate individually; that is, one plate of each pair being adjustable, and the other rigid. The invention described in this claim is for arranging the way-plates in series, and making one series adjustable in relation to the other, substantially as set forth in the specification. * * * This is the first instance, as I understand it, in which nail-ways formed of pairs of plates arranged in series are so constructed as that the whole series may be adjusted simultaneously. * * * I wish to emphasize the value of carrying the way-plates of the feeder on frames, and adjusting the frames at one operation, by which means a nail may be inserted at any place in the way-plates of the feeder, and the adjustment be then effected at one operation, whereupon it will be found that every part of every nail channel of the feeder is properly adjusted. The nail may be inserted at any part of any ' channel, and, after the adjustment is effected, every other part of every nail channel will be found to have been correctly adjusted. * * * Claim 6 relates to the way-plate supporting frames, which supporting frames each carry one set of the mates of way-plates constituting the boundary of the nail channels [through which the nails move point downward, hanging by the head], said frames being arranged for adjustment in relation to each other for adjusting the width of the nailways of the feeder; and the invention described consists in the combination with the nail-feeding mechanism and said frames of frame-adjusting screws, substantially as shown and described. Boiled down into its simplest form, the invention consists in a pair of frames, each frame carrying one series of way-plates, and a screw adjustment for adjusting the width of the nail channels between the way-plates, all at once. * * * It was not new at the date of the patent in suit to provide a machine for automatically feeding nails to the nail-driving mechanism, with way-plates which were individually and separately adjustable; but this feature, although old at the time of the patent in suit, was the product of the patentees of the patent in suit, and fully described," etc., "in their patent No. 276,639, dated May 1, 1883."

If the feature referred to were old and already patented at the time of the patent in suit, it makes no difference that such other patent issued to the same patentee. This suit is brought solely upon the later patent, and the earlier one was outstanding against it when it was issued. Underwood v. Gerber, 149 U. S. 224, 13 Sup. Ct. 854, 37 L. Ed. 710.

From these excerpts, it is manifest that the new device of the fifth and sixth claims is a very simple one. Before the patent there were nailways consisting of a series of plates brought so close to another series of plates that the nails would hang down between each pair of plates, supported by their heads; and, of these, one series was made individually adjustable, so as to conform the space between each pair of plates to nails of different sizes. When a change of adjustment was required, each plate of the movable series was itself adjusted. The only improvement has been to fasten each plate rigidly to a movable frame, so that movement of the frame would move all the plates of that series at once. It is an improvement, because it saves time. How much time is thus saved is not entirely clear, upon the record. Whether or not the saving is important would depend, of course, upon the number of times it might, in the course of operation, become necessary to change the size of the nails used. But whether it were greater or less, the majority of the court are of the opinion that the device employed to effect it is a simple and obvious mechanical contrivance, quite within the intelligence of the ordinary skilled workman to produce, and that it does not disclose patentable invention, under the

authorities. As to a "device for separating the two sets of rolls of a double roller-mill by one movement," it was held that it "required no invention to connect the shaft by which the cams in one movable roll were operated simultaneously with cams of the other movable roll" in a double mill. The ordinary and well-known device by which all the bolts in an iron safe door are shot by the movement of a single lever seems fully to anticipate whatever there is in the second claim of the Odell patent." Consolidated Roller Mill v. Barnard & Leas Co. (C. C.) 43 Fed. 527. The Court of Appeals in the Sixth Circuit had before it a patent for a letter file composed of two parallel wire arches, rotated simultaneously. The court approved the decision of the judge who heard the cause at circuit, expressed thus:

"The expert testified that the principal difference between the operation of the single file and that of the double file consisted in operating the vibrating wires of the latter simultaneously by means of connecting mechanism, and that, considered as an abstract principle, he did not regard the connecting of two old devices to operate simultaneously as invention, when the operation and function of each in their connected relation was the same as that performed by each when used singly. The expert was right in the view thus expressed." Office Specialty Co. v. Globe Co., 23 C. C. A. 242, 77 Fed. 465.

In a case which involved devices for simultaneously lifting two pulleys, over which a cable was running, this court said:

"If it is of importance simultaneously to raise two disconnected but adjacent objects of comparatively small size, which can be accomplished by a small expenditure of force, it would seem natural to connect them by a rod, and also that the experiment would be within the ordinary scope of the mechanic who is in charge of the work of construction." Mayor of New York v. American Cable Railway Co., 17 C. C. A. 467, 70 Fed. 853.

See, also, Aron v. Manhattan Ry. Co., 132 U. S. 84, 10 Sup. Ct. 24, 33 L. Ed. 272.

It sometimes happens that devices which are extremely simple, and which seem so obvious an application of common knowledge as to preclude their classification as inventions, are nevertheless shown by the testimony to possess patentable novelty. When it appears that the improvement, slight though it was, led from failure to success; that, though failure was appreciated and success sought for by skilled mechanics, no one before the patentee hit on this way to secure it; and that, when the improvement was made, it was generally accepted and the patent for it respected by those practicing the art—courts are constrained to hold that the simple device is a patentable invention. Schenck v. Singer Mfg. Co., 23 C. C. A. 494, 77 Fed. 841; Brunswick-Balke Co. v. Thum, 50 C. C. A. 61, 111 Fed. 904. The record in this case, however, is not persuasive to such a conclusion. If it be conceded (and we do not intend to hold that the evidence requires such concession) that all the complainant contends for in that regard is true; that all prior box-nailing machines were failures; that the machine of the patent was the first practical and commercially successful one; that it was accepted by the art, and has since monopolized the field—nevertheless such evidence is not helpful to a solution of the question presented on these two claims. There is nothing to show that this minor improvement in one part of the machine

contributed at all to any such far-reaching results. Speaking of the prior state of the art concerning the adjustment of the way-plates, complainant's expert is careful to "emphasize the fact that this feeder way-plate construction is combined with other elements insuring the proper delivery of the nails thereto, and the proper cutting out or cutting off of the nails into the chutes of the nail boxes. In other words, a nail pan must be provided which will bring the nails in series to the way-plates of the feeder, suspended by their heads in proper position to be delivered to the nailways of the feeder, for, if the nailways of the feeder be not continuously and properly supplied with nails in proper position to be conducted thereto, the machine will not operate properly. In other words, we are dealing here with an entire organism, to wit, a feeding device for inevitably bringing the nails in proper supply to the chutes, so that the feeding mechanism and the nailing mechanism will operate in harmony." These two claims, however, do not include the nail-supply box, nor the devices for securing passage from that box to the nailways, nor the devices for cutting them out at the end of the nailways and delivering them to the chutes, nor the nail chutes, nor the nailing mechanism. Of the 620 lines of the specification, barely 25 deal with the construction and operation of the nailways; and, for aught that the record discloses, the meritorious features of complainant's box-nailing machine may lie wholly within the other parts of the completed structure. In the opinion of the majority of the court, there seems to be no reason, therefore, to modify the conclusion above expressed that the improvement covered by the fifth and sixth claims does not disclose any patentable invention.

The decree of the Circuit Court is affirmed, with costs.