BRUNSWICK–BALKE–COLLENDER CO. v. ROSATTO.

(Circuit Court, E. D. Pennsylvania. February 21, 1908.)

No. 43.

1. PATENTS—CONSTRUCTION OF CLAIMS—REFERENCE LETTERS TO DRAWINGS.

The use in a claim of a patent of a letter of reference to the drawings which show a part composed of two pieces does not limit the patentee to a two-piece construction where it is not of the essence of the invention claimed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 243.]

2. SAME—INVENTION—BOWLING ALLEY.

The Wiggins patent, No. 623,933, for a bowling alley having a concave side trough or gutter, discloses novelty, but is void for lack of invention. being merely for the substitution of one common form of construction for another, the function remaining the same, and the substituted form having previously been similarly and suggestively used in other structures, and without any extraordinary, even if of a fair, degree of merit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 20.]

3. SAME—RETURN RUNWAY.

The Wiggins patent, No. 554,611, for a ball runway for bowling alleys, is void for lack of patentable invention.

In Equity. Bill for the infringement of letters patent, No. 623,933, issued April 25, 1899, to W. H. Wiggins, for a bowling alley; and also of letters patent, No. 554,611, issued February 11, 1896, to the same, for a ball runway for such alleys. On final hearing.

James Q. Rice, for complainants.
E. Hayward Fairbanks, for respondent.

ARCHBALD, District Judge.[1] There are two patents in suit, both issued to the same inventor, and both relating to certain adjuncts of bowling alleys. Infringement is admitted as to the one, for a ball run-

[1] Specially assigned.

way or return way, which has been copied without any pretense at a difference; and is clearly established as to the other, for a concave side trough or gutter, the only distinction attempted being that the respondent makes it in three pieces where the figures of the patent show but two, the inventor being supposed to have confined himself

## COMPLAINANT'S GUTTER.

## DEFENDANT'S GUTTER.

to the latter construction by the use in the claim of a reference letter.[2] I have recently considered the effect of such a reference in Kelsey

[2] "The combination with the bed, or ball way, A, of a bowling alley; and a suitable stringer, or strip, running parallel with the edge of the alley-bed at a suitable distance therefrom, of a bottom piece, C, the top surface of which is concave, in cross-section, and operates to cause a ball rolling thereon to travel centrally thereto; all in substantially the manner and for the purpose hereinbefore set forth."

Hearing Co. v. James Spear Stove Co. (C. C.) 155 Fed. 976, and see no reason to vary from what is there said. An additional authority to those cited will be found in Electric Candy Machine Co. v. Morris (C. C.) 156 Fed. 972. There is no occasion in the present instance in order to save the invention to limit the claim to the particular construction shown in the drawings, and the reference to them must therefore be regarded as simply generally descriptive, which the change from two pieces to three which has been made by the respondent cannot be permitted to evade.

The case turns therefore on the validity of the patents and considering first the one for a concave gutter, there can be no question as to the novelty, as applied to a bowling alley, of this construction, the only kind previously used being square. It is true that in the Arff & Bornholdt table, designed for a sort of pin pool game, with cue, and balls, and pins, a concave trough, on each side of the table, is shown. But while this may be a suggestive, it is not a directly anticipatory, use, the purpose of it being to return the balls to the player, instead of to take care of those which by inaccuracy of aim have gone off the track, the one being slow moving and innocuous, where the others are destructively swift. The same thing is to be said with regard to the Chambers game, where pins are displaced by slowly trundled balls, which are returned to the play end of the table by means of concave troughs on either side. And so also in the Roberts Bowling-crease, while the side gutters may be brought somewhat nearer to the case in hand by being applied to bowling alleys, they are V and not concave or U shaped, and slope back also to the starting point so as to automatically return the balls. These are all the references of any consequence, and whatever lack of invention they may indicate in the adaptation of a concave trough as the side gutter of a bowling alley, the novelty of it, as so applied, remains.

This patent has been before the courts with varying results. It was declared invalid by Judge Lacombe, on application for a preliminary injunction, in the Klumpp Case (C. C.) 124 Fed. 554, on the strength of the Chambers and the Roberts patents, although the defendants, having sold out their interests, subsequently submitted to a decree. 131 Fed. 93. But in the Beyer Case (C. C.) 145 Fed. 353, it was sustained by Judge Ray on final hearing, and on appeal he was affirmed. 146 Fed. 1022, 76 C. C. A. 678. Similar decrees in favor of the patent were also secured in suits brought by the present complainants in the Eastern District of New York and in the district of New Jersey, the cumulative force of which, and the apparent acquiescence of the public as so indicated, is not without its effect. It is suggested that none of these cases was closely contested, if indeed some of them were not collusive, and it must be confessed that they do not seem to have been fought out, as has the one here. But, however that may be, at the most they are persuasive only, and are not to be followed, if upon independent consideration a different conclusion is reached. Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 865.

The question as to this patent is therefore the invention involved, which at best is not much, but is claimed to be enough, on the

strength of the advance made and the utility shown. It consists, as it is said, not simply in the idea of a concave gutter, but in the general arrangement of which this is a part, by which definite and desirable results are obtained. A serious defect of the square gutter, according to this, is that misplayed balls, flying off the alley bed, bound from side to side, not only being thereby themselves chipped at the finger holes, but splintering and battering down the exposed and unsupported alley edge, and loosening and starting the nails in the gutter bottom. In a concave gutter, on the other hand, not only does the ball center at once, and proceed quickly in a right line to the pit, avoiding wearing contact with the alley edge, but the pieces which form the gutter bed are made to brace and guard the alley stringers, contributing to the same end. Such a gutter, also, is much less noisy, as it is said, and being round cornered instead of square is more easily kept clean. As affecting the play, several advantages are claimed. In a square gutter, for instance, the lines, as it is pointed out, are all straight, and the edge of the alley in consequence is not well defined to the bowler's eye, disturbing the accuracy of his aim. And not only cannot a ball get back onto the alley from a concave gutter—a fruitful source of dispute—but neither can the outer pins of the back row be hit by a ball, in such a gutter, doing away with the necessity for cutting the gutter down at that end, as is sometimes done. Skilled bowlers, moreover, often deliver a curving ball, which at points hangs over the edge of the alley, so that if the alley bed is at all worn it lets the ball down into the gutter, spoiling the bowl; which forms an additional reason why the alleys have to be kept up and emphasizes the importance of whatever saves the wear. There is also said to be a popular sentiment among players in favor of a concave over a square gutter because of the belief that it conduces to a better score, pins falling into it being more liable to fly back and knock down others, confirmatory of which, in order to eliminate such "scratch" plays, the bowling rules now require that the last three feet of the gutter shall be square. The superiority so claimed for a concave over a square gutter, and the defects with which the latter are charged, are earnestly denied by the respondent, and cannot be said to be clear. The displacement of the one by the other, which, to a certain extent, has been proved, is also attributed to the monopoly of bowling alley construction which the complainants enjoy, and to a sentiment which they have been careful to inspire. But without going into this, utility is not always the test of invention, however persuasive of it at times. Daylight Glass Co. v. American Prismatic Light Co., 142 Fed. 454, 73 C. C. A. 570. And, conceding all that is claimed for the one gutter over the other, the question still remains whether anything inventive is in fact shown.

It is to be observed, as to this, that a concave gutter is a common and not at all complicated construction, which any ordinary workman, possessed of the usual mechanical skill could produce, if the necessity for and the desirability of it was seen. And it would no doubt surprise most of them to learn that it had been monopolized by a patent, which prevented its use, if for any reason they were called to put one in. It is also a most natural one for a ball, conforming as it does to

its shape, and is found in the patents referred to above in a cognate and suggestive, if not a directly anticipating, use. The patentee, thus, invented nothing new in this regard, but simply took that which was at hand, in general use, and applied it without change of function in place of another common form, because of its supposed superiority for the purpose. The force of this is evidently felt by counsel, as shown by the suggestion alluded to above, that the invention does not reside broadly in the idea of a concave in place of a square gutter, but in the relation which that form of gutter is made to bear to the other parts of the alley, by which new and beneficial results are produced. The fact, however, is that, putting aside the verbiage of the patent, by which the advantages of the device are proclaimed, the whole invention will be found to lie in the simple provision that the gutter shall be concave instead of square, with that which this necessarily brings about. It would unduly extend this opinion to quote from the specifications in proof of this, but a careful reading leads to nothing else. And, confirmatory of it, it will be noted that, as expressed in the single claim of the patent, and aside from the combination specified with the other parts, the invention is made to consist essentially, in "a bottom piece, * * * the top surface of which is concave in cross section," to which the functional quality ascribed, that "it operates to cause a ball rolling therein to travel centrally thereto," adds nothing, if indeed it is not out of place.

Nor, as bearing on the question of invention, was the adoption of this device attended by any of the circumstances which are sometimes relied on to make that out. There was no preceding and insistent demand, for instance, for a new character of gutter to take the place of the old one, the defects of which were recognized and remained unsupplied. Neither were other inventors striving unsuccessfully to attain the same end. Nor was the advance made by the concave over the square gutter so marked, nor has it gone into such immediate and unquestioned use, as to show that it met an expectant need. On the contrary, the advantages claimed for it, are regarded by many who are competent to speak, as exaggerated if not fanciful, and the demand for it as altogether forced; while those qualities which may have some substance, such as the bracing and protection of the edges of the alley, and the centering of the balls by the concavity of the gutter, preventing them from bounding from side to side, are the natural and obvious results of the means employed. Without anything therefore to take it out of the ordinary, or anything structurally new devised, the case presenting nothing more than simply the substitution of one common form of construction for another, the substituted form also having been already similarly and suggestively used, and being of no extraordinary, even if of a fair, degree of merit, the function, also, if improved, remaining practically the same, invention is not made out, and the patent cannot be sustained.

Nor is the other patent in suit more fortunate. The ball track or return way, which is there shown, consists of a sharply descending portion at the pit end, down which the balls acquire a considerable impetus, an intermediate flat or horizontal portion along which they run, and an oblique ascending portion, up which they proceed, but

which so moderates and overcomes their momentum that they come to a rest on the horizontal terminal at the end, without ramming into each other or the stop post, as they otherwise would, to say nothing of smashing the fingers of incautious players while selecting a ball. But the sizes of the balls differ, some being large and some comparatively small, and the return way must do for both, calling, for convenience, for a separation of them at the end. They also move at a different speed, with the result that if the ascending grade is graduated to check or brake that of the small ones, it is not enough for the large ones, which fly up it with undue force. And, on the other hand, if accommodated to the large ones the small ones will not go up it at all. To remedy this, the grade is fixed with reference to the large balls alone, and a cut out hole or opening is introduced into the runway, at the foot of or a slight distance up the incline, as stated in the specifications, small enough to permit the large balls to pass over, but large enough to let the small ones through, which are thus gathered together on a lower rack. But however ingenious and effective this may be, in some respects at least it has been anticipated. the same general arrangement. appearing in the Reisky patent, excepting only that there the cut out hole for the small balls is located at the top instead of at the bottom of the retarding incline. The applications of Reisky and

## REISKY.

## WIGGINS.

Wiggins were pending in the patent office at the same time, and upon an interference being threatened Wiggins disclaimed and Reisky was given a patent for the generic idea, Wiggins confining himself to his own special form. If that were all, the question between the two would be whether there was a saving distinction. But the Reisky patent, representing the generic idea, has itself been the subject of controversy and can no longer be regarded as valid. It was sustained, it is true, by the Court of Appeals of the Second Circuit in the Thum Case, 111 Fed. 904, 50 C. C. A. 61; but was questioned by Judge Loch-

ren, on application for a preliminary injunction, in the Koehler & Heinrichs Case (C. C.) 115 Fed. 648. And a runway with an accelerating and retarding incline at opposite ends having been found to have been previously used in the Catskills, a formal disclaimer was entered by the present complainants, as owners of the patent, excluding a construction in which the homing of the balls was not accelerated, and confining it to one in which greatly increased speed in their return from the pit to the play end was secured and injurious concussion at the same time prevented. But this was held by Judge Wallace in the Klumpp Case (C. C.) 126 Fed. 765, to eliminate whatever was previously patentable, and this on appeal was affirmed (131 Fed. 255, 65 C. C. A. 447); a certiorari from the United States Supreme Court being subsequently denied (198 U. S. 587, 25 Sup. Ct. 803, 49 L. Ed. 1174). This then being the fate of the Reisky and the fundamental idea being thus declared old, it is difficult to see how anything patentably inventive remains. The only distinction in the device in suit consists, as we have seen, in the location of the sorting hole, which is put at the foot of the retarding incline or a slight distance up it, instead of at the top, thereby allowing the small balls to be separated and proceed to the play end, without other check than such as they receive from passing over and along the intermediate horizontal section of the return way, and permitting the incline to be graduated to suit the large balls alone. No doubt this contributes materially to the successful operation of the device, which is incomplete and imperfect without it. Nor is it to be disposed of upon the suggestion, that, as compared with the Reisky, it amounts to nothing more than the mere shifting of a hole. Patents have been sustained upon changes which were no greater. Neither does it follow that, because the Reisky was anticipated, the Wiggins is also, the inventive advance, although a mere improvement, being possibly sufficient. Conceding all this, however, I am forced to conclude that this cannot be said of it. The successive acceleration and retarding of the balls by oppositely inclined planes at either end with a horizontal section in between, not being new, nor the sorting of the large and the small balls by a cut out hole, located in the path of both, it cannot be regarded as inventive, simply to make use in that connection of the well-known principle, that small balls, impelled by the same impetus, move with less momentum than large ones, and thereupon to adjust the means employed for checking the two by a relocation of the sorting hole at the foot of the retarding incline or such a distance up it as will be effective for the small balls, leaving the rest of it to be graduated to suit the large ones. This is the whole inventive idea, which is thus comprised not only in the mere shifting of the cut out hole a little one way or the other, to accommodate it to the different speed of the balls, but the use, in so doing, of an obvious expedient to meet an obvious need. This is not invention, and the patent, being without anything to sustain it, is therefore void.

The same conclusion having been thus reached as to both the patents in suit, the bill must be dismissed, with costs.